# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

ALCAN FOREST PRODUCTS, LP, an
Alaska Limited Partnership,

        Plaintiff,

    v.

A-1 TIMBER CONSULTANTS, INC., a
Washington Corporation,

        Defendant.

Case No. 5:11-cv-00001-SLG

## ORDER RE FOUR PENDING MOTIONS

This litigation concerns a contract dispute between Plaintiff Alcan Forest Products, LP ("Alcan") and Defendant A-1 Timber Consultants, Inc. ("A-1"). Before the Court are numerous motions, including three motions for summary judgment and a motion to amend the answer. This Order is intended to address these four pending motions. Each has been fully briefed, and on June 21, 2013, the Court heard oral argument on the motions:[1]

1. At Docket 58, A-1 moves for summary judgment on all claims made by Alcan.[2]

2. At Docket 72, Alcan moves for summary judgment on A-1's affirmative defense of impossibility of performance.[3]

3. At Docket 74, A-1 moves for leave to amend its answer and to include various affirmative defenses and counterclaims.[4]

---

[1] Docket 147 (Minute Entry).

[2] *See* Docket 58 (A-1 MSJ); Docket 71 (Alcan Opp. MSJ); Docket 88 (A-1 Reply MSJ).

[3] *See* Docket 72 (Alcan MSJ Impossibility); Docket 97 (A-1 Opp. Impossibility); Docket 115 (Alcan Reply Impossibility).

4.  At Docket 77, A-1 moves for summary judgment on estoppel grounds.[5]

The remaining motions will be addressed by separate order.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an April 2010 contract between Alcan and A-1, in which A-1 committed to bring a feller buncher to Southeast Alaska to assist Alcan in harvesting second growth timber at Coon Cove and Long Island.[6]  Alcan is in the business of buying and selling timber in Southeast Alaska, but Alcan itself does not actually harvest timber.[7]  Evergreen Timber, LP ("Evergreen"), which is not a party to this litigation, is a logging company managed and owned by the same entities as Alcan.[8]  Evergreen's business is harvesting timber.[9]  As of 2009, A-1 was in the business of "cutting timber, harvesting timber, and buying and selling timber."[10]

## I.  Alcan Purchases Right to Harvest Timber on Long Island and at Coon Cove.

In 2005, Alcan contracted with Cape Fox Corporation for the "exclusive right to cut, remove and appropriate" certain timber in various locations near Ketchikan, Alaska,

---

[4]  *See* Docket 74 (A-1 Mot. Amend); Docket 93 (Alcan Opp. Amend); Docket 107 (A-1 Reply Amend).

[5]  *See* Docket 77 (A-1 MSJ Estoppel); Docket 114 (Alcan Opp. Estoppel); Docket 134 (A-1 Reply Estoppel).

[6]  *See* Docket 1-2 (Complaint).  A feller buncher is a machine that grasps a standing tree at its base, cuts the tree at ground level, and lays the tree in a pile or "bunch."  This system may reduce the number of human timber fallers on a job.  *See* Docket 59-9 ¶¶ 3-4 (3/5/13 Loushin Decl.).

[7]  Docket 38-5 at 16:14-17:2 (8/15/12 Brown Dep.).

[8]  Docket 66-1 ¶ 12 (3/25/13 Nichols Decl.).

[9]  Docket 38-5 at 17:15-20 (8/15/12 Brown Dep.).

[10]  Docket 49-1 at 14:19-15:14 (8/15/12 Loushin Dep.).

including Coon Cove.[11]   The timber at Coon Cove was "salvaged timber"—timber left over after prior logging operations—and predominantly second growth.[12]   Harvesting the timber at Coon Cove would require that Alcan construct a logging road into the sale area.[13]   Through several contract extensions, Alcan had the right to remove timber from Coon Cove through December 31, 2010.[14]

In 2007, Alcan contracted with K-Ply, Inc., a subsidiary of Klukwan, Inc., for the purchase and sale of timber on Long Island.[15]   The timber on Long Island was also mostly second growth.[16]   Alcan had determined that the most economical way to harvest most of the second growth timber on Long Island was by using a feller buncher.[17]   Timber not cut by the feller buncher could be hand cut.[18]   Alcan's right to remove timber from Long Island expired on December 31, 2011.[19]

---

[11]   Docket 59-1 (5/27/05 Timber Cutting Right Contract, between Cape Fox Corp. and Alcan).

[12]   *Id.*; Docket 66-1 ¶¶ 32-33 (3/25/13 Nichols Decl.).

[13]   Docket 66-1 ¶ 34 (3/25/13 Nichols Decl.).

[14]   *Id.* ¶ 35; Docket 59-1 at 7 (12/31/09 Am. No. 2 to Timber Cutting Right Contract).

[15]   *See* Docket 59-2 (Am. No. 1 to Long Island 2007 Timber Sale Agreement between Alcan and K Ply, Inc.).

[16]   *See* Docket 66-1 ¶¶ 28-29 (3/25/13 Nichols Decl.).

[17]   *Id.*

[18]   *Id.* ¶ 28.

[19]   *See* Docket 59-2 (Am. No. 1 to Long Island 2007 Timber Sale Agreement between Alcan and K Ply, Inc.).

## II.  Alcan Arranges to Harvest, Contracting with Evergreen and Contacting A-1.

In March 2010, Alcan contracted with Evergreen to harvest timber on Long Island.[20]   Evergreen's responsibilities included "furnish[ing] all labor, equipment, supplies and competent supervision."[21]   This seems to include housing and feeding loggers, building roads, moving fallen timber, and bundling timber for transportation.[22] The contract provided that Evergreen would be paid based on the volume of board feet of timber harvested (commonly referred to as MBF).[23]   If Evergreen did not produce logs, it was not paid.[24]   The parties dispute why Alcan planned to harvest Long Island in the 2010 timeframe.   A-1 asserts that Alcan was not in a hurry to harvest Long Island and that Alcan profited from delaying the harvest "due to a longer period for growth."[25] A-1 directs the Court to Nichols's deposition testimony explaining the delay where he testified "that the market situation was such that we were waiting for a better market."[26] Alcan asserts that it chose 2010 because of the unavailability of a contractor prior to

---

[20]   Docket 59-3 (3/17/10 Logging and Road Construction Contract; Long Island Timber Sale, between Alcan and Evergreen).

[21]   *Id.*; Docket 38-7 at 44:4-14 (8/14/12 Nichols Dep.).

[22]   Docket 58 at 4 (A-1 MSJ); Docket 38-7 at 44:4-14 (8/14/12 Nichols Dep.).

[23]   Docket 59-3 at Ex. A (3/17/10 Logging and Road Construction Contract; Long Island Timber Sale, between Alcan and Evergreen).

[24]   Docket 66-1 ¶ 72 (3/25/13 Nichols Decl.).

[25]   Docket 58 at 13 (A-1 MSJ); *see also* Docket 38-5 at 29 (Brown Dep.) (noting that prior to 2010, "[A-1] w[as]n't in any hurry to harvest [Long Island]."); Docket 59-10 ¶ 5 (3/5/13 Jendro Decl.).

[26]   Docket 38-7 at 37:11-22 (8/14/12 Nichols Dep.).

that time—that is, before that, Evergreen was committed on other contracts.[27]   Alcan also asserts that its decision whether to harvest Coon Cove was dependent upon finding a contractor that could complete the harvesting on Long Island and at Coon Cove prior to expiration of both contracts.[28]   Alcan would not harvest Coon Cove unless it could find a contractor that could do both, thus making it economical for Alcan to build the necessary access road.[29]

As noted above, because much of the timber on Long Island and at Coon Cove was second growth, Alcan sought to use a feller buncher.  Neither Alcan nor Evergreen had a feller buncher in Southeast Alaska, so Alcan representatives Brian Brown and Eric Nichols reached out to A-1 president, Tom Loushin, to discuss a potential contract for use of A-1's feller buncher.  Brown, Nichols, and Loushin met in Ketchikan, Alaska, in March 2010 to discuss the project.[30]   Alcan asserts that during that meeting, Brown and Nichols informed Loushin of their time restrictions on harvesting Coon Cove and Long Island because of the 2005 and 2007 contracts.[31]

In his declaration, Nichols states that he inquired as to Loushin's other projects in Alaska because Alcan would not have contracted with A-1 if it had known that A-1 intended to engage in other contracts at the same time.[32]   Alcan's concern was that A-1

---

[27]  Docket 71 at 4 (Alcan Opp. MSJ); Docket 66-1 ¶¶ 25-26 (3/25/13 Nichols Decl.).

[28]  Docket 66-1 ¶ 40 (3/25/13 Nichols Decl.).

[29]  *Id.* ¶¶ 39-40, 42.

[30]  *Id.* ¶ 38.

[31]  Docket 71 at 7 (Alcan Opp. MSJ); Docket 66-1 ¶¶ 47, 50-51, 54 (3/25/13 Nichols Decl.).

[32]  Docket 66-1 ¶ 57 (3/25/13 Nichols Decl.).

might spread its resources too thin.[33]   Ultimately, Loushin contracted with Leisnoi, Inc. to harvest on Kodiak Island during the same time period as the Long Island and Coon Cove project.[34]   But at Loushin's deposition, he testified that Brown and Nichols never told him that they would not hire A-1 if it was to accept other projects.[35]

Loushin's general practice is to visit a job site before contracting to send a feller buncher.[36]   At the meeting in March 2010, Loushin was shown pictures of Long Island and Coon Cove.[37]   However, the parties dispute whether Brown and Nichols offered or were willing to take Loushin to see the sites.   Loushin asserts that Alcan could not or would not take him to view the sites.[38]   Nichols, on the other hand, states that Loushin declined an offer to visit and view conditions.[39]   There is no dispute that Loushin did not see the sites at Long Island and Coon Cove prior to signing the contract on behalf of A-1.

### III.  Alcan and A-1 Contract, and the Harvesting Begins.

On or about April 15, 2010, the parties entered into their contract, pursuant to which A-1 would bring a single feller buncher to harvest second growth timber at Long

---

[33]  *Id* .¶¶ 57-58.

[34]  Docket 66-5 at 62:14-65:20 (8/15/12 Loushin Dep.).

[35]  *Id.* at 63:6-64:9.

[36]  Docket 73-3 at 29:6-18 (8/15/12 Loushin Dep.).

[37]  Docket 49-1 at 28:17-23, 33:13-16 (8/15/12 Loushin Dep.); Docket 66-1 ¶ 53 (3/25/13 Nichols Decl.).

[38]  Docket 98-1 ¶ 4 (5/1/13 Loushin Decl.); Docket 49-1 at 29 (8/15/12 Loushin Dep.).

[39]  *See* Docket 66-1 ¶¶ 48-49 (3/25/13 Nichols Decl.); Docket 66-2 at 49 (8/14/12 Nichols Dep.).

Island and Coon Cove.[40]  The contract indicated that its "term" would be for "one 1

logging season, commencing on or about April 15, 2010 and terminating on October 31,

2010 or upon completion."[41]

The contract provided that Alcan would pay "$220 per cutting hour" for a single

"Tigercat 370" feller buncher (the "Tigercat").[42]  The parties entered into a pay-per-

cutting-hour agreement, rather than a pay-per-volume-cut agreement, which is more

typical in the industry.  In Loushin's declaration, he states that the parties used the pay-

per-cutting-hour agreement for a variety of reasons, including to "reduce[] risks to both

parties because of mutual uncertainties about the ground conditions, camp conditions,

and whether a feller buncher in Southeast Alaska could fall timber at a rate consistent

with normal operating conditions."[43]  He also states that A-1 contracted for this payment

method because it was difficult to distinguish between mechanically and hand-cut trees,

and because of "Alcan's refusal to take" him to visit the sites.[44]  Alcan asserts that

Loushin negotiated an "exceedingly high hourly rate" to cover A-1's risk of any

uncertainty from not seeing the sites.[45]

The contract included a "time is of the essence" clause.  It also included a clause

requiring A-1 to comply with the Worker's Compensation Act and provide Alcan with a

---

[40]  Docket 38-10 (Contract).

[41]  *Id.* ¶ 2.

[42]  *Id.* at Ex. B (Contract Price Schedule).

[43]  Docket 98-1 ¶ 4 (5/1/13 Loushin Decl.).

[44]  *Id.*; *see also* Docket 73-3 at 31:21- 32:14 (8/15/12 Loushin Dep.).

[45]  Docket 72 at 4 (Alcan MSJ Impossibility).

certificate of compliance.[46]   At paragraph 21, the contract provided Alcan the right to terminate:

> 21.  ALCAN'S RIGHT TO TERMINATE - REMEDIES:  In case Contractor shall fail to perform any part of this contract by him to be performed promptly and in the manner herein specified, Alcan may, at its option, terminate this contract and all rights of the Contractor hereunder by giving written notice of such termination to Contractor personally or by mail addressed to the Contractor at the address appearing herein.  In such event Alcan shall be entitled to take immediate possession of the above described lands and the timber thereon and all logs cut therefrom and to remove Contractor, his agents, servants and employees from said lands.[47]

The contract also included a clause in which each party agreed to maintain an on-site representative to assist in "day-to-day management issues":

> 27.  ON SITE REPRESENTATION:  The parties agree that each of them will have a representative on site authorized to represent them on day-to-day management issues.   Each party agrees to keep the on[-]site representative of the other informed of all material developments and all items requiring notice.[48]

In the contract, Alcan identified Eric Nichols and A-1 identified Dan Ward, a feller buncher operator, as on-site representatives.[49]

A-1's Tigercat arrived at Long Island on April 29, 2010.  At his deposition, Ward testified that he had concerns about the operation of the Tigercat "from an hour after being there" because "[t]here was way too much debris on the ground [and] the ground was too soft," which caused the Tigercat to sink.[50]  During the initial days of operation,

---

[46]  Docket 38-10 ¶¶ 8, 18 (Contract).

[47]  *Id.* ¶ 21.

[48]  *Id.* ¶ 27.

[49]  *Id.*

[50]  Docket 38-11 at 11:20-24 (9/22/12 Ward Dep.).

Alcan provided no telephone communication at the Long Island camp, so Ward was not able to immediately communicate these problems to Loushin.[51] But Ward shared his concerns with Mike Doig, Evergreen's supervisor of operations at Long Island.[52]

Due to mechanical breakdowns, A-1's feller buncher operated only 25 or 32 out of 69 days between April 29, when the machine arrived at Long Island, and July 6, when Alcan terminated the contract.[53] For example, the Tigercat did not operate from April 30, 2010, when the turbo charger failed, until after it was repaired on or about May 5, 2010.[54] During that breakdown, Ward made a trip to Ketchikan for replacement parts, at which time he was able to share his concerns with Loushin.[55] The machine broke down again on May 10, 2010, when the tool tilt cylinder failed, and was inoperable until May 28, 2010.[56] Then, on June 15 or June 22, 2010, a cutting blade failed.[57] The Tigercat was not repaired again until after Alcan terminated the contract.[58] During this time, Evergreen employees at Long Island conducted mostly "non-logging related jobs

---

[51] *Id.* at 12:11-19 ("[U]ntil the first breakdown I couldn't call Tom if I had wanted to . . . . There was no communication with nobody.").

[52] *Id.*

[53] There is some dispute concerning whether the Tigercat was operating between June 16 and 22. The motion for summary judgment states that the Tigercat's cutting blade failed on June 15, 2010. But A-1's Notice Regarding Changed Facts Based on Newly-Produced Evidence, at Docket 143, states that the blade failed on June 22, 2010. There is a pending motion to strike the notice, but this date is not determinative to any issue in this Order.

[54] Docket 66-7 (Interrogatory Answers).

[55] Docket 38-11 at 12:20-23, 13:11-14:6 (9/22/12 Ward Dep.).

[56] Docket 66-7 (7/26/12 Interrogatory Answers).

[57] As noted in footnote 53, there is some dispute concerning this date.

[58] Docket 66-7 (7/26/12 Interrogatory Answers). The "termination" is discussed in more detail below.

to keep busy, but were able to log as trees were handcut."[59]   According to Nichols, Evergreen employees were kept on the payroll to discourage them from leaving the remote camp at Long Island to find paying jobs elsewhere.[60]   Ward testified in his deposition, however, that there was nevertheless high employee turnover due to the "conditions" at the Long Island camp.[61]

Despite the on-site representative clause in the contract, the evidence demonstrates that neither party's designated on-site representative was present at Long Island every day.  Nichols was present at Long Island to "set[] the camp up"[62] and to watch the Tigercat operate during the first few days.[63]   He also made subsequent visits.[64]   But he was on Long Island only approximately 13 days during the course of the contract.[65]   A-1's representative, Ward, who was also the Tigercat operator, was present every day that the Tigercat was operable, but he was also absent many days.[66]

---

[59]  Docket 66-1 ¶ 76 (3/25/13 Nichols Decl.).

[60]  *Id.* ¶¶ 77-79.

[61]  Docket 38-11 at 19:5-19 (9/22/12 Ward Dep.) ("[A]ny time a plane would come in[,] people would run for the float plane to get out of there because there was no communication and because of the conditions.").

[62]  Docket 38-7 at 53:23-54:1 (8/14/12 Nichols Dep.).

[63]  *Id.* at 56:6-8 (8/14/12 Nichols Dep.); Docket 66-1 ¶ 68 (3/25/13 Nichols Decl.).

[64]  Docket 66-1 ¶¶ 68-70 (3/25/13 Nichols Decl.).

[65]  Docket 94-2 ¶ 3 (4/29/13 Nichols Decl.).  There is some dispute concerning precisely how many days Nichols was present, but there is no doubt that he was absent many days.

[66]  Docket 94-1 (7/26/12 A-1 Response to Plaintiff's First Discovery Requests); Docket 85-3 at 34:8-35:1 (9/22/12 Ward Dep.).  It appears Ward was only absent when there was a problem with the machine because of his efforts to repair the machine.

After A-1 began operating on Long Island, Alcan learned that A-1 had contracted with Leisnoi, Inc. for timber operations on Kodiak Island.[67]   A-1 asserts that after this, Alcan withdrew logistical support for the Long Island operation.[68]   Ward testified that Alcan representatives were not helpful when A-1 requested assistance.[69]   But there does not appear to be any clause in the contract requiring Alcan to provide assistance to A-1.

## IV. After Several Tigercat Breakdowns, Alcan's "Terminates" the Contract, but Proceeds with Harvesting on Long Island and at Coon Cove.

On July 6, 2010, about 20 days after the mid-June cutting blade failure, Brown wrote a letter on behalf of Alcan to A-1, terminating the contract.[70]   The letter stated:

> Pursuant to Paragraph 21 of the Contract dated April 15, 2010 between Alcan Forest Products and A-1 Timber, you are hereby notified that you have committed a material breach of said contract. The breaches which you have committed include the following:
>
> 1) Failure to provide Alcan proof of Worker[s'] Compensation coverage for A-1's employees in the state of Alaska after repeated requests. (Paragraph 18)
>
> 2) Failure to carry on work in a diligent and continuous manner until all activities are complete.  (Paragraph 8)[71]

---

[67]  Docket 38-6 at 82:18-83:8 (8/15/12 Brown Dep.).

[68]  Docket 58 at 7 (A-1 MSJ); Docket 38-11 at 90:12-92:13 (9/22/12 Ward Dep.).

[69]  Docket 38-11 at 90:12-92:13 (9/22/12 Ward Dep.).  At Ward's deposition, in response to a question concerning whether Alcan would assist in transporting people, equipment, or parts between Ketchikan and Long Island, Ward stated that "Alcan wouldn't help with anything."  For example, Ward requested assistance from Brown, who had a boat, in transporting a disk for the Tigercat, and although Brown provided "a couple of names . . .[,] he wanted no part of helping [Ward]."

[70]  Docket 66-11 (7/6/10 Termination Letter Alcan to A-1).

[71]  *Id.*

Loushin's wife, Sharon Loushin, responded to the letter by email, stating:

> I just got back in the office to this letter. We have not given you the Workers['] compensation because Dan Ward is a Corporate Manager on Salary and is Exempt from the workers['] comp. As you know the machine has been down several times and we have had to have parts shipped up there. Therefore the work has not been done in a timely manner. This is unfortunate, however if you want us to Cease and Desist from the job, we will be there and get our equipment off the island.[72]

Tom Loushin also responded:

> We understand your [sic] we will send you proof of Alaska workers['] com[p] as soon as the ladies return to the office[.] as for the parts for the machine they are being flown from Ketchikan to long island today[.] if you want us to remove are [sic] machine and stop work let me no [sic][.] I will make the arrangements ASAP tom[.][73]

A few days later, on July 9, 2010, Brown wrote a letter to Sharon Loushin, stating that Alcan "understand[s] that [A-1] acknowledges that it is in default on the contract," but "[i]f this is not accurate; please notify Alcan immediately. Meanwhile, we will consider the contract terminated."[74] The same day, Sharon Loushin responded, explaining that there were "many problems with the Machinery breaking down," but that A-1 "do[es] not feel we were in default."[75]

On June 30, 2010, Alcan and Evergreen amended their contract to include that Evergreen would "pursue purchase of a Feller Buncher" to harvest at Long Island and Coon Cove.[76] The contract amendment stated that Alcan would pay "a sum equal to

---

[72] Docket 66-12 (7/7/10 Email Sharon Loushin to Nancy Brown).

[73] Docket 66-14 (7/7/10 Email Tom Loushin to Nancy Brown).

[74] Docket 59-7 (7/9/10 Letter Brian Brown to Sharon Loushin).

[75] Docket 59-8 (7/9/10 Letter Sharon Loushin to Brian Brown).

[76] Docket 59-3 (6/30/10 Am. 1 to Long Island Logging Contract); Docket 66-1 ¶¶ 154-56 (3/25/13 Nichols Decl.).

the 2 year depreciation amount," as well as $220 per feller buncher operating hour.  On July 1, 2010, Evergreen purchased a used Madill feller buncher (the "Madill") for $200,000.[77]  According to George Barnes, who operated the Madill for Alcan, the Madill operated "efficiently" at Long Island and Coon Cove in 2010 and 2011, and "without experiencing the degree of mechanical breakdowns experienced by" the Tigercat.[78]  But at his deposition, Ronald Perry, another Evergreen employee who also operated the Madill, described several mechanical problems with the machine.[79]  He also stated that logging on Long Island was "extreme" and "an everyday battle," and that the machine would get "stuck" in the soft ground.[80]

In October 2010, Alcan purchased an extension on its contract to harvest at Long Island from December 31, 2011 through December 31, 2012.[81]  Alcan asserts that "[t]he extension was necessitated by the delay in production of logs caused by A-1's breach in cutting timber."[82]  Alcan attempted, but was unable, to negotiate a contract extension for harvesting Coon Cove; instead, in March 2011, Alcan entered into a stumpage only

---

[77]  Docket 59-6 (7/1/10 Hermann Brothers Invoice for Madill); Docket 66-1 ¶¶ 152-53 (3/25/13 Nichols Decl.).

[78]  Docket 66-10 ¶¶ 6, 14 (3/25/13 Barnes Decl.); *see also* Docket 55 at 6 (2/15/13 Alcan Witness List).

[79]  Docket 59-5 at 19:18-21:1 (10/1/12 Perry Dep.); *see also* Docket 61 at 11 (3/7/13 A-1 Witness List).

[80]  Docket 59-5 at 21:6-22:10, 23:3-23:20 (10/1/12 Perry Dep.).

[81]  Docket 58 at 3 (A-1 MSJ); Docket 59-2 (Am. No. 1 to Long Island 2007 Timber Sale Agreement); Docket 66-1 ¶ 81 (3/25/13 Nichols Decl.).

[82]  Docket 66-1 ¶¶ 11, 22 (3/25/13 Nichols Decl.)

contract with Cape Fox for harvesting at Coon Cove.[83]  Alcan asserts that A-1's alleged breach caused a delay in cutting the Coon Cove timber, which ultimately resulted in Alcan's requiring the stumpage contract.[84]

Alcan filed suit against A-1 on or about March 18, 2011, in the Superior Court for the State of Alaska in Ketchikan.[85]  In the complaint, Alcan asserts various claims related to breach of contract and violation of the Unfair Trade Practices and Consumer Protection Act.[86]  A-1 removed the case to this federal court on the basis of diversity of citizenship on April 8, 2011.[87]

As noted above, there are now numerous motions pending before the Court, but this Order addresses only the motion to amend and the three motions for summary judgment.

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  In this diversity action, the Court applies state law to substantive legal issues and federal law to procedural issues.[88]

---

[83] *Id.* ¶¶ 107-12.

[84] *Id.* ¶¶ 105-113.

[85] Docket 1-2 (Complaint).

[86] *Id.*

[87] Docket 1 (Notice of Removal).

[88] *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) ("Because this case arose under the district court's diversity jurisdiction, 28 U.S.C. § 1332, we apply state substantive law, but we apply federal procedural law.").

**DISCUSSION**

## I. A-1's Motion at Docket 74 to Amend the Answer will be Granted in Part and Denied in Part.

At Docket 74, A-1 moves for leave to amend its answer to assert the affirmative defenses of statute of frauds, misrepresentation, and impossibility/impracticability of performance, and to assert counterclaims for fraudulent misrepresentation, material misrepresentation, breach of contract, and violations of Alaska's Unfair Trade Practices and Consumer Protection Act. A-1 asserts that the Court should permit amendment under Federal Rule of Civil Procedure 15 because there was no undue delay, as critical evidence only surfaced after recent disclosures, and because Alcan has been aware of A-1's allegations of misrepresentation "for a period of months."[89] A-1 further asserts that permitting amendment either causes no prejudice, or that "Alcan brought any prejudice on itself" through its late disclosures.[90]

In its motion, A-1 describes the conflicting positions of the parties as to whether Loushin wanted to inspect Long Island prior to entering into the contract, and then it focuses on alleged misrepresentations by Alcan concerning its on-site representative. Specifically, A-1 states that evidence demonstrating misrepresentations only recently came to light. For example, although the April 2010 contract identified Nichols as Alcan's on-site representative and Alcan's December 2011 preliminary disclosures stated that Michael Doig was Alcan's on-site representative (despite Alcan's contract

---

[89] Docket 74 at 2-3 (A-1 Mot. Amend). At oral argument, A-1 argued that Alcan had been playing "hide the ball" with discovery, exhibiting a consistent pattern of nondisclosure.

[90] *Id.* at 2; Docket 107 at 5 (A-1 Reply Amend).

with Doig, which stated that he was not an agent),[91] at Nichols's August 2012 deposition, he testified that "Brian (Brown) ran th[e] operation" at Long Island.[92] But in Nichols's March 2013 declaration, he again acknowledges that he was Alcan's on-site representative.[93] A-1's motion does not address the additional alleged misrepresentations laid out in the proposed amended answer, for example that Alcan failed to disclose its relationship with Evergreen and failed to disclose its 2010 harvest plans for Long Island and Coon Cove.[94] Likewise, although described in the proposed amended answer, A-1's motion does not address its statute of frauds or impossibility/impracticability defenses, or claims concerning breach of contract.

Alcan opposes the motion, arguing that it is untimely and that permitting amendment would cause prejudice and unreasonable delay, requiring the Court to reopen discovery.[95] Alcan also asserts that A-1's misrepresentation claim is not viable.[96] Like A-1's opening brief, Alcan's opposition focuses primarily on the on-site representative misrepresentation issue. A-1's reply faults Alcan for not addressing the other "fifteen separate misrepresentations" in A-1's proposed amended answer, and

---

[91] Docket 74 at 3-4 (A-1 Mot. Amend); Docket 75-1 (12/19/11 Alcan Preliminary Disclosures) (identifying Doig as an "Alcan Representative"); Docket 75-2 (3/21/10 Service Agreement between Alcan and Doig) (stating Doig is not an agent).

[92] Docket 38-7 at 54:10-13 (8/14/12 Nichols Dep.)

[93] Docket 66-1 ¶¶ 62, 68 (3/25/13 Nichols Decl.).

[94] Docket 74-1 at 12-13 ¶¶ 32(a), (k) (A-1 Proposed Amended Answer).

[95] Docket 93 (Alcan Opp. Amend). Alcan did agree that A-1 could raise the impossibility defense without seeking leave of the court. *Id.* at 1, n.1.

[96] *Id.*

states that "[t]hese allegations speak for themselves and are incorporated in A-1's motion . . . ."[97]

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave" to amend "when justice so requires." In deciding "a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic."[98] Generally, prejudice results where allowing amendment would impose "additional litigation costs . . . that could have easily been avoided."[99] However, "when a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party must satisfy the 'good cause' standard of Federal Rule of Civil Procedure 16(b)(4)."[100] In those circumstances, the court "may take into account any prejudice to the party opposing modification of the scheduling order," but should focus its inquiry on "the moving party's reasons for seeking modification . . . . If that party was not diligent, the inquiry should end."[101]

Here, the Scheduling and Planning Order, issued on July 19, 2011, states: "Motions to . . . amend the pleadings subsequent to the date of this order must be

---

[97] Docket 107 at 4 (A-1 Reply Amend).

[98] *Chodos v. W. Publ. Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (affirming denial of leave to amend complaint); *see also AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 957 (9th Cir. 2006).

[99] *AmerisourceBergen*, 465 F.3d at 957 (affirming denial of leave to amend a reply, where motion to amend was filed fifteen months after defendant learned of claim but still within pretrial scheduling order's deadlines for amendment).

[100] *In re W. States Wholesale Nat. Gas Antitrust Litig*, 715 F.3d 716, 736 (9th Cir. 2013).

[101] *Id.* at 736 (quoting *Johnson v. Mammoth Rec., Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)).

served and filed not later than January 2, 2012. Thereafter, . . . pleadings [may be] amended only upon leave of court and for good cause shown."[102]  A-1's motion to amend was not filed until April 11, 2013, fifteen months after the Scheduling Order's deadline.  Thus, under Federal Rule of Civil Procedure 16 and the Scheduling and Planning Order, A-1 must show "good cause" before amendment will be permitted.[103]

A-1 has failed to demonstrate the requisite "good cause."  A-1's request is unreasonably tardy.  Through diligent discovery, A-1 could have earlier explored  its concerns about Loushin's inability to visit the sites and Alcan's on-site representative. Since the time that Ward operated the Tigercat on Long Island, A-1 could have been aware that the contract identified Nichols as Alcan's on-site representative but that he was often absent from Long Island.  Indeed, A-1 asserts the affirmative defense of estoppel in its original answer.[104]

With respect to alleged misrepresentations concerning Alcan's relationship with Evergreen and Alcan's harvest plans, A-1 presents no argument that it made timely discovery requests to uncover this information.  A-1 has known of Alcan's ownership interest in Evergreen since, at the latest, August 2012.[105]  A-1 has known of Alcan's claim of Evergreen pass-through damages since, at the latest, Alcan's June 2012

---

[102]  Docket 14 (7/19/11 Scheduling Order).

[103]  *See W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d at 736.

[104]  The Court addresses *infra* A-1's motion for summary judgment on estoppel, which further details the on-site representative issue.

[105]  *See* Docket 37 at 2 (A-1 Mot. Compel Trans-Pac) (discussing ownership interests); Docket 38-7 at 8:19-14 (8/14/12 Nichols Dep.).

disclosures, which state that Alcan seeks damages for costs incurred by Evergreen.[106] The discovery deadline in this case was initially June 2012, but it was extended through November 2012 and then March 2013.[107] Through these extensions, A-1 had adequate time to follow up on the June and August disclosures. And although Alcan produced some Evergreen documents during discovery,[108] A-1 is not thereby permitted to disregard corporate formalities and rely upon Alcan to informally produce all Evergreen documents. Thus, at the June 21, 2013 hearing, in considering A-1's motion to compel Alcan to produce Evergreen employment records, the Court concluded that Alcan did not improperly withhold those documents or fail to make mandatory disclosures with respect to them pursuant to Federal Rule of Civil Procedure 26.[109] The lack of timely and comprehensive discovery requests is not "good cause" to permit amendment after the deadline. Finally, while A-1 asserts that the allegations of the remaining misrepresentations "asserted in the proposed amended complaint speak for themselves

---

[106] *See* Docket 38-13 (6/5/12 Preliminary Disclosures); *see also* Docket 90-3 (7/25/12 Alcan Responses to First Discovery Requests) (identifying Evergreen as a "person[] who w[as] hired to work or worked on the Coon Cove or the Long Island timber harvest projects for Alcan" during the relevant time period).

[107] Docket 14 (7/19/11 Scheduling Order); Docket 25 (5/21/12 Pretrial Order); Docket 36 (11/5/12 Order Granting Joint Motion to Continue Trial).

[108] *See* Docket 37 at 7 (A-1 Mot. Compel Trans-Pac), in which A-1 acknowledges that Alcan produced some documents. The Court granted in part and denied in part that motion to compel, which is not relevant to the currently pending motions. *See* Docket 51 (Order on Mot. Compel Trans-Pac).

[109] *See* Docket 76 (A-1 Mot. Compel Records); Docket 147 (Minute Entry). The Court denied that motion as moot because, by that date, Alcan had disclosed the requested records.

and are incorporated in A-1's motion,"[110] this conclusory argument does not meet the good cause standard.

In addition, amendment at this time would be prejudicial. When the motion was filed, this litigation had been pending for almost two years. Allowing amendment would likely require that the Court reopen discovery and alter the trial date, resulting in unreasonable additional expense and further delays.

However, with respect to the affirmative defense of impossibility/impracticability, the parties have conducted the relevant discovery and Alcan has moved for summary judgment on the defense. Alcan will not be prejudiced by A-1 asserting that defense at trial.

For the foregoing reasons, A-1's motion to amend the complaint at Docket 74 will be granted with respect to the impossibility/impracticability defense, but will be otherwise denied**.**

## II. Motions for Summary Judgment.

### A. Standard of Review.

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of showing the absence of a genuine dispute of material fact lies with the moving party.[111] If the moving party meets this burden, the non-moving party must present specific evidence demonstrating

---

[110] Docket 107 at 4 (A-1 Reply Amend).

[111] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

the existence of a genuine issue of fact.[112]  The non-moving party may not rely on mere allegations or denials.[113]  It must demonstrate that enough evidence supports the alleged factual dispute to require a finder of fact to make a determination at trial between the parties' differing versions of the truth.[114]

When considering a motion for summary judgment, a court must accept as true all evidence presented by the non-moving party and draw "all justifiable inferences" in the non-moving party's favor.[115]  To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[116] The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[117]  If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment is appropriate.[118]

### B.  A-1's Motion at Docket 58 for Summary Judgment Will Be Denied.

Alcan has identified six categories of damages sought in this litigation:  (1) delay damages in the amount of $129,166.60; (2) the cost of the extension of the Long Island contract in the amount of $50,000.00; (3) depreciation of the Madill in the amount of $80,000.00; (4) transportation of the Madill in the amount of $17,059.95; (5) the sum

---

[112]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[113]  *Id.* at 248-49.

[114]  *Id.* (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

[115]  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[116]  *Id.* at 248.

[117]  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

[118]  *Anderson*, 477 U.S. at 249.

paid for the new contract for Coon Cove in the amount of $333,007.00; and (6) the cost of additional hand cutters to harvest Coon Cove in the amount of $125,450.00.[119] Alcan does not seek lost profits related to the sale of the timber.

A-1 moves for summary judgment on all claims, arguing that Alcan's alleged damages are not recoverable because Alcan ultimately profited from any alleged delay; that Alcan cannot recover damages for "fixed costs" of maintaining the camp at Long Island; that Alcan cannot recover any damages incurred after Alcan's termination of the contract; and that Alcan failed to mitigate damages, for example with respect to its purchase of contract extensions and use of Evergreen's Madill.[120]

For the reasons discussed herein, numerous material questions of fact preclude the entry of summary judgment.

1. *Material Questions of Fact Remain as to Whether Alcan's Damages Should be Reduced by its Profits.*

A-1 argues that Alcan cannot recover any damages because Alcan profited from any delay caused by A-1's alleged breach of contract.[121] A-1 asserts that Alcan made more money by selling the timber in 2011 instead of 2010 because of the increase in sale prices in Asia for Alaska logs, and also because the delay allowed the timber additional time to grow.[122] The opinion of A-1's expert, David Jendro, provides the

---

[119] Docket 71 at 14 (Alcan Opp. MSJ).

[120] Docket 58 (A-1 MSJ).

[121] Docket 58 at 15 (A-1 MSJ).

[122] *Id.* at 13.

factual basis and calculations for A-1's position.[123]  In response, Alcan contends that A-1's alleged breach caused a delay, which resulted in Alcan selling the timber into a depressed log market.[124]  Alcan further asserts that any profits from the eventual sale are not relevant because the purpose of Alcan's contract with A-1 was only that A-1 should cut timber; the contract did not contemplate Alcan's sale of timber.  Alcan also asserts that because it regularly sells logs into the market, Alcan's lost profits as a result of A-1's breach cannot be determined with reasonable certainty.[125]

Contract damages are intended to compensate an injured party so that it is put in the same position that it would have been in had the breaching party performed the contract.[126]  An injured party "has a right to damages based on [its] expectation interest . . . plus . . . any other loss, including incidental or consequential loss, caused by the breach."[127]  Where the jury finds in favor of a plaintiff, the jury may award damages if it finds that the plaintiff demonstrated the loss "with reasonable certainty" and that the loss was foreseeable.[128]  An injured party must make reasonable efforts to mitigate

---

[123]  *Id.* at 13, 23; Docket 59-10 ¶¶ 3-5 (3/5/13 Jendro Decl.).

[124]  Docket 71 at 29 (Alcan Opp. MSJ); Docket 66-1 ¶¶ 130-134 (3/25/13 Nichols Decl.).

[125]  Docket 71 at 30 (Alcan Opp. MSJ).  In addition, Alcan asserts that Jendro's report is not admissible as an expert report and that his calculations and conclusions are based on faulty assumptions.  The admissibility of Jendro's report, including the alleged inaccuracy of facts that he relied upon, is the subject of a separate motion, filed at Docket 82.

[126]  *Murray E. Gildersleeve Logging Co. v. N. Timber Corp.*, 670 P.2d 372, 377 (Alaska 1983); *see also* Alaska Civil Pattern Jury Instruction ("ACPJI") 24.09A.

[127]  *Am. Computer Inst. v. State*, 995 P.2d 647, 655 (Alaska 2000) (quoting Restatement (Second) of Contracts § 347).

[128]  *See* ACPJI 24.09A.

damages, and it may be compensated for expenses reasonably incurred in that effort.[129]

Under Alaska law, in some circumstances an injured party's ability to recover may be limited by profits made after the alleged breach of contract. In this diversity action, Alaska's substantive law is controlling. In *Murray E. Gildersleeve Logging Co. v. Northern Timber Corp.*, the Alaska Supreme Court held that "[w]hile the wronged party in a breach of contract suit is entitled to the benefit of his bargain, he is not entitled to any more than his actual loss."[130] In that case, Northern Timber Corp. ("NTC") contracted for Murray E. Gildersleeve Logging Co. ("MEG") to harvest a specified amount of timber at Shakan Bay. After commencing operations, MEG later abandoned the Shakan Bay operation (and thus the NTC contract). NTC then logged Shakan Bay itself and sold the timber to a third party. NTC sued MEG for related damages. At trial, a jury found in favor of NTC and awarded damages.

On appeal, MEG argued that the jury instructions contained errors with respect to mitigation and calculating damages.[131] With respect to mitigation, the instructions had provided that the jury must determine whether NTC's decision to log and sell certain timber to a domestic market was done in an effort to minimize NTC's damages or as a separate operation. The supreme court held this instruction was proper. But the trial court had then instructed the jury that it could not consider NTC's profits from exporting certain timber in measuring NTC's damages. Instead, the jury was instructed that it was

---

[129] *See* ACPJI 24.10; ACPJI 20.18A & B.

[130] *Gildersleeve*, 670 P.2d at 378.

[131] *Id.*

required to compute damages based on the additional costs incurred by NTC to harvest the timber itself. The Alaska Supreme Court held that this instruction was error, as it "usurped the jury's fact-finding authority" by assuming that production of the domestic timber was part of NTC's mitigation efforts. If the domestic logging was part of mitigation, then NTC's overall profits were lower and the profits would not reduce damages. However, if it was not mitigation, then the court's instructions inappropriately prohibited the jury from reducing damages against MEG by the profits earned by NTC on its exported timber. Thus, the instruction improperly "forced [the jury] to assume that domestic timber was logged in an effort to minimize losses."[132] The court remanded, explaining that, "[o]n remand, . . . the jury should be instructed to compute damages by the more accurate and equitable method of profit differentials."[133] This is because although "NTC's expectation interest may be measured . . . by cost differentials, . . . the evidence shows that a measure of damages based on diminution of profits would also give NTC the benefit of its bargain, and at less cost to MEG."[134]

Alcan asserts that *Gildersleeve* is not applicable because that case's "loss avoided" rule applies only where there is a "substitute transaction," and Alcan asserts that it never entered into a substitute transaction to avoid the losses caused by A-1's default.[135] Alcan notes that *Gildersleeve* involved a logging contract, while the contract

---

[132] *Id.* at 380.

[133] *Id.*

[134] *Id.* at 381.

[135] *See* Docket 71 at 25 (Alcan Opp. MSJ) (discussing Restatement (Second) Contracts § 347, concerning "actual loss caused by breach").

at issue in this case is a service contract for the provision of a feller buncher. But just as in *Gildersleeve*, there is a material dispute in this case as to whether the subsequent logging and selling of the timber was done in an effort to minimize Alcan's losses or damages.[136] Thus, it is an issue for the jury's determination.

The Court notes that other jurisdictions may follow a rule that might disregard profit differentials, as summarized by Corbin on Contracts: "Gains made by the injured party on other transactions after the breach are not to be deducted from damages that are otherwise recoverable, unless such gains could not have been made had there been no breach."[137] However, in this diversity case, Alcan has not directed the Court to any authority that indicates that the Alaska Supreme Court would depart from its holding in *Gildersleeve*.

Although *Gildersleeve* is binding, the Court nevertheless concludes that material questions of fact remain precluding summary judgment. As noted above, the parties appear to disagree on whether Alcan's subsequent harvesting activities were done in an effort to minimize Alcan's losses resultant from A-1's alleged breach. And the parties disagree on when the logs were actually sold and whether Alcan's ultimate profits were increased or decreased as a result of the delayed harvest.[138] In short, multiple issues of material fact preclude summary judgment on the damages claim.

---

[136] *Gildersleeve*, 670 P.2d at 379.

[137] 11-57 Corbin on Contracts § 57.13; *see also KGM Harvesting Co. v. Fresh Netw*ork, 36 Cal. App. 4th 376, 382 (Cal. Ct. App. 1995) (declining to reduce damages for U.C.C. sale of goods because buyer was later able to make a profit, explaining "[w]hat the buyer chooses to do with that bargain is not relevant to the determination of damages under section 2712").

[138] Docket 58 at 13, 23 (A-1 MSJ); Docket 59-10 ¶¶ 3-5 (3/5/13 Jendro Decl.); Docket 71 at 29 (Alcan Opp. MSJ); Docket 66-1 ¶ 130 (3/25/13 Nichols Decl.).

2. *Material Questions of Fact Remain Concerning Whether Alcan May Recover Fixed Costs for an "Idle Camp."*

Alcan seeks damages for Evergreen's costs of operating the Long Island camp for the period prior to July 6, 2010 when A-1's Tigercat was nonoperational. During that time, Evergreen employees performed "non-logging related jobs to keep busy."[139] Evergreen seeks recovery of these "delay damages" from Alcan. A-1 asserts that because the Evergreen employees were working, Alcan and Evergreen benefited from their labor, and Alcan cannot recover these fixed costs.[140]

In this diversity action, this issue must be analyzed applying state law. Alaska precedent provides some guidance on the recovery of these damages. In *Quality Asphalt Paving, Inc. v. State*, the Department of Transportation ("DOT") contracted for plaintiff construction company to widen a road.[141] After the DOT invoked the contract's "termination-for-convenience" clause, plaintiff sought damages, including "overhead expenses directly allocable to the project termination," which incorporated "organizational, administrative, and other general costs that are incurred for continuing operations."[142] The Alaska Supreme Court affirmed a hearing officer's award of these overhead expenses. *Quality Asphalt* is distinguishable from the case at hand, however, because that contract specifically provided for the recovery of "overhead expenses" and

---

[139]  Docket 71 at 15-16 (Alcan Opp. MSJ).

[140]  Docket 88 at 3, 8 (A-1 Reply MSJ).

[141]  *Quality Asphalt Paving, Inc. v. State*, 71 P.3d 865 (Alaska 2003).

[142]  *Id.*

"reasonable equipment idle time," while A-1 and Alcan's contract does not contain any such provision.

*State v. Northwestern Construction Co.* also provides some guidance.[143]   In that case, the plaintiff contractor was hired to construct a new runway at the Anchorage airport.  The trial court held that the State was responsible for the excessive costs of the project, and awarded the contractor damages.  The Alaska Supreme Court affirmed the majority of the trial court's damages award, finding that an award of "10% of increased cost for overhead" was proper where the "breach result[ed] in the contractor having to do *extra* work" and the contract called for "equitable adjustment" when more work ended up being required than had been bid.[144]   The supreme court noted that "mere delay does not necessarily increase direct costs," but the court nonetheless permitted damages as a percentage of increased costs because the plaintiff had demonstrated actual increased costs.[145]

The parties also discuss *Precision Pine & Timber, Inc. v. United States*, a Federal Circuit Court of Appeals decision.[146]   There, the court permitted recovery of overhead damages, but concluded that the plaintiff was not entitled to the entire amount requested because some of its request was actually the "fixed costs of operating Precision Pine's sawmills—namely, the cost of labor, taxes, and insurance," which were

---

[143]   *State v. Nw. Constr. Co.*, 741 P.2d 235 (Alaska 1987).

[144]   *Id.* at 240 (emphasis in original).

[145]   *Id.* at 240-41 (citing *Bennett v. United States*, 178 Ct. Cl. 61, 371 F.2d 859, 863-64 (1967); *Elias v. Wright*, 276 F. 908, 910 (2d Cir. 1921); *A.T. Klemens & Sons v.  Reber Plumbing & Heating Co.*, 139 Mont. 115, 360 P.2d 1005, 1011 (Mont. 1961)).

[146]   *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010).

part of the company's permanent sawmill operating facility and that the company would have to pay regardless of the contract.[147] But *Precision Pine* is easily distinguishable from this case, because a permanent sawmill is not the same as a temporary logging camp.[148]

Here, material questions of fact remain concerning whether Alcan can recover Evergreen's fixed costs when the Tigercat was not operational. Fundamentally, the parties dispute whether and to what extent the camp was actually idle when the TIgercat was not operational. This alone precludes summary judgment on this element of damages. The fundamental inquiry is whether and to what extent the damages sought are consequential and foreseeable damages of the alleged breach; these are questions for the trier of fact.

3. *Material Questions of Fact Remain Concerning "Post-Termination" Damages and Mitigation.*

Alcan seeks damages for the extension of the Long Island contract and the new Coon Cove contract, asserting that these contracts were only necessary because of A-1's breach.[149] Alcan also seeks damages for depreciation and transportation of the Madill and for additional hand cutters to harvest at Coon Cove, asserting that these expenses were necessary to complete the timber harvesting. For example, Alcan

---

[147] *Id.* at 834.

[148] *Id.* at 834.

[149] Docket 71 at 4, 7 (Alcan Opp. MSJ); Docket 66-1 ¶¶ 9, 11, 22, 113 (3/25/13 Nichols Decl.).

asserts that A-1's breach caused an "urgency to cut Coon Cove" because of the upcoming expiration of the Cape Fox contract, which is why Alcan hired hand cutters.[150]

In its motion for summary judgment, A-1 asserts that these damages are not recoverable because they were incurred after Alcan terminated the contract.[151] A-1 also asserts that A-1's alleged breach was not the cause of Alcan's purchase of the Long Island extension; rather, Alcan purchased the extension to harvest additional timber.[152] As for Coon Cove, A-1 asserts that Alcan would not have required an extension if Evergreen employees had finished harvesting in 2010, and it disputes Alcan's calculations comparing the cost of harvesting Coon Cove with a feller buncher with the cost of the additional hand cutters.[153] With respect to the Madill, A-1 asserts that permitting recovery for depreciation would result in "double recovery" because Alcan also benefited from the use of the machine,[154] that Alcan has confused depreciation and salvage value,[155] and that Alcan has failed to provide support for the full amount it seeks to recover for the Madill's transportation from Seattle to Long Island.[156] The majority of A-1's arguments amount to a contention that Alcan failed to mitigate damages.

---

[150] Docket 71 at 19 (Alcan Opp. MSJ).

[151] Docket 58 at 20-21 (A-1 MSJ); Docket 88 at 8-9 (A-1 Reply MSJ).

[152] Docket 88 at 5 (A-1 Reply MSJ).

[153] Docket 58 at 13 (A-1 MSJ).

[154] Docket 88 at 6 (A-1 Reply MSJ).

[155] Docket 59-10 ¶ 7 (3/5/13 Jendro Decl.).

[156] Docket 58 at 12 (A-1 MSJ).

The Court first addresses the termination issue. On July 6, Alcan sent to A-1 an email titled "Notice of Termination," stating that, pursuant to paragraph 21, Alcan "hereby terminates" the contract.[157] Paragraph 21 allows Alcan to terminate, "[i]n case [A-1] shall fail to perform any part of this contract by him to be performed promptly and in the manner . . . specified" in the contract[158]—that is, if A-1 breaches the contract. A-1 asserts that Alcan cannot recover damages incurred after the termination, citing the Uniform Commercial Code (U.C.C.) definition of termination, which provides:

> "Termination" occurs when either party, under a power created by agreement or law, puts an end to the contract otherwise than for its breach. On "termination" all obligations that are still executory on both sides are discharged, but a right based on a prior breach of performance survives.[159]

A-1 also cites to *United Airlines v. Good Taste*.[160] But *Good Taste* is not helpful because in that case the Alaska Supreme Court was applying Illinois law, and the contract at issue there permitted a party to terminate without cause simply upon 90 days notice. Here, in contrast, Alcan could only terminate after it determined that A-1 had failed to perform under the contract.

Alcan maintains that the U.C.C. does not apply because the contract at issue was not for the sale of goods; rather, it was for service of a feller buncher.[161] And, regardless of the U.C.C.'s applicability, the above-cited provision only applies when a

---

[157]  Docket 66-11 (7/6/10 Termination Letter Alcan to A-1).

[158]  *Id.* ¶ 21

[159]  Docket 58 at 20 (A-1 MSJ) (citing AS § 45.02.106).

[160]  *Id.* at 20-21 (discussing *United Airlines, Inc. v. Good Taste, Inc.*, 982 P.2d 1259 (Alaska 1999)).

[161]  Docket 71 at 43-44 (Alcan Opp. MSJ).

party puts an end to a contract "otherwise than for its breach."[162]  Alcan further maintains that "every breach of contract gives rise to an immediate remedy."[163]  At oral argument, Alcan further asserted that because the termination notifications were written by non-lawyers, they were not intended to invoke the legal results of a contract termination.

This Court agrees that the U.C.C. is not applicable to this services contract. Furthermore, Corbin on Contracts specifically recognizes that the terms "termination," "cancellation," and "discharge" are often used interchangeably, and it suggests that courts "should never assume that contracting parties knew and distinguished accurately between the terms."[164]  Here, paragraph 21 allowed Alcan to terminate only if A-1 failed to perform under the contract.  The terms of the contract do not speak of Alcan's ability to recover post-termination damages.[165]  Based on the current record, the Court does not find that the contract was intended to eliminate Alcan's ability to recover post-termination damages if A-1 breached, when Alcan could otherwise recover full breach of contract damages if it elected not to invoke the termination clause.[166]

---

[162]  AS § 45.02.106.

[163]  Docket 71 at 43-44 (Alcan Opp. MSJ) (discussing 4 A. Corbin, Corbin on Contracts § 946 (1960)).

[164]  13-67 Corbin on Contracts § 67.2.

[165]  Compare Docket 59-3 ¶ 21 (3/17/10 Logging and Road Construction Contract; Long Island Timber Sale, between Alcan and Evergreen), which provides that the right to terminate "shall not be deemed exclusive but shall be in addition to all other remedies at law or in equity which Alcan may have in connection with this contract and the breach thereof."

[166]  Whether Alcan can recover post-termination damages at all will depend on whether it can demonstrate that it properly invoked the termination clause, only after A-1 "fail[ed] to perform any part of th[e] contract . . . to be performed promptly and in the manner . . . specified . . . ." See Odom v. Lee, 999 P.2d 755 (Alaska 2000) (whether breach is material is question of fact).

Of course, after "termination," Alcan still had a duty to mitigate damages, and material questions of fact in that regard preclude summary judgment on mitigation damages. For example, Alcan asserts that because of A-1's breach, Evergreen purchased the Madill to provide services to Alcan. But it is unclear why Alcan seeks damages for two years of Madill depreciation (during which time the machine was allegedly operating effectively) to complete a contract that A-1 intended to complete in approximately five months. And Alcan asserts that it would not have required the new Coon Cove contract but for A-1's breach.[167] But at the same time, Alcan has indicated that it "urgen[tly]" hired hand cutters at Coon Cove. These questions of mitigation should be resolved by a jury.

*4. Alcan Presented Sufficient Proof of Damages to Survive Summary Judgment.*

A-1 also argues that Alcan has failed to prove its loss with reasonable certainty.[168] A-1 cites to the deposition of Brian Brown, who estimated damages on behalf of Evergreen and Alcan.[169] At his deposition, Brown conceded that his calculations were based, in part, on guesswork.[170] At the same time, Brown also described, in detail, how he estimated Evergreen's and Alcan's damages.[171]

---

[167] Docket 66-1 ¶ 113 (3/25/13 Nichols Decl.).

[168] Docket 58 at 19, 20 (A-1 MSJ).

[169] Docket 66-13 (3/27/13 Brown Decl.).

[170] Docket 38-6 at 114:4 (8/15/12 Brown Dep.).

[171] *See* Docket 66-4 (8/15/12 Brown Dep.); Docket 66-13 (3/27/13 Brown Decl.).

A party seeking damages "need only prove its damages to a 'reasonable certainty.'"[172]  The amount of damages need not be proved "with exact detail, but the evidence must provide a reasonable basis for the jury's determination."[173]  The Court concludes that Brown's estimates are a sufficient basis on which to base a damages award so as to survive summary judgment.  For the same reasons, A-1 is not entitled to summary judgment on Alcan's UTPA claim.

For all of the foregoing reasons, A-1's motion at Docket 58 for summary judgment will be denied.

### C. Alcan's Motion at Docket 72 for Summary Judgment on A-1's Affirmative Defense of Impossibility Will Be Denied.

The Court has held that A-1 may file an amended answer asserting the affirmative defense that "performance [of the contract was] excused by the doctrine of impossibility or impracticability of performance."[174]  At Docket 72, Alcan moves for summary judgment on this affirmative defense.  It asserts that the conditions at Long Island were foreseeable; that Alcan representatives offered to take Loushin to see the sites, but he declined; and that A-1 understood the potentially problematic conditions, which is why Loushin negotiated a high-rate, pay-per-cutting-hour agreement.[175]  Thus,

---

[172]  *Nw. Const. Co.*, 741 P.2d at 237.

[173]  *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636 (Alaska 1996); *see also Borgen v. A&M Motors, Inc.*, 273 P.3d 575, 592 (Alaska 2012) (testimony providing a "range of values on which the jury could have based its damages verdict" was sufficient to uphold award of damages).

[174]  *See* Docket 74-1 (A-1 Proposed Amended Answer).

[175]  A-1 did not raise the affirmative defense of impossibility or impracticability in its original answer.  *See* Docket 11 (A-1 Answer).  Alcan's motion for summary judgment attempts to distinguish impossibility and impracticability, moving for summary judgment on impossibility and noting that A-1 has not claimed impracticability.  Docket 72 at 9 n.79 (Alcan MSJ Impossibility) ("A-1 has not claimed 'commercial impracticability' . . . .").  A-1 now seeks to assert both

Alcan argues that A-1 assumed any risk of difficulties in using the feller buncher. Alcan further asserts that A-1 could have, but failed to, include a contract clause allowing A-1 to terminate should contract performance prove unprofitable.[176] Alcan cites to several Alaska cases discussing the defense of impossibility/impracticability.[177] Alcan also argues that performance could not have been impracticable, given that Evergreen ultimately utilized the Madill at Long Island.[178]

A-1 opposes summary judgment, arguing that the ground conditions were not foreseeable, and that Brown and Nichols refused to take Loushin to see the sites.[179] A-1 also asserts that its performance was excused as impracticable because Alcan failed to maintain a proper on-site representative at Long Island (i.e., Nichols was not present and Doig lacked authority), and because poor working conditions at Long Island

---

defenses. *See* Docket 74-1 (A-1 Proposed Amended Answer). Because Alaska case law defines impossibility to incorporate impracticability, *see Gildersleeve*, 670 P.2d at 375, the distinction is irrelevant for purposes of this motion.

[176] Docket 72 at 9 (Alcan MSJ Impossibility) (discussing *U.S. Smelting, Ref. and Min. Co. v. Wigger*, 684 P. 2d 850, 857 (Alaska 1984), in which contract provided for termination if mining under contract was found to be no longer profitable).

[177] *See id.* (discussing *Currington v. Johnson*, 685 P.2d 73 (Alaska 1984) and *State v. Carpenter*, 869 P.2d 1181, 1183-84 (Alaska 1994)). In *Carpenter*, a debtor farmer failed to repay a loan and argued that performance was excused because farming his land was not profitable under the loan contract. The Alaska Supreme Court concluded that the doctrine of impracticability did not excuse performance. The supreme court noted that the contract contained a clause which specifically recognized the State's disclaimer as to the soil's condition. And the case was before the supreme court on review of a directed verdict after a bench trial, not on review of an order granting summary judgment. For these reasons, this Court finds *Carpenter* is distinguishable.

[178] Docket 72 at 9 n.79 (Alcan MSJ Impossibility); Docket 66-10 ¶ 7 (3/25/13 Barnes Decl.).

[179] Docket 98-1 ¶ 4 (5/1/13 Loushin Decl.); Docket 49-1 at 29 (8/15/12 Loushin Dep.).

made operations "extreme and unreasonably difficult" and caused high employee turnover.[180]

Alaska courts recognize the affirmative defense of "[i]mpossibility of performance . . . as a valid defense to an action for breach of contract when the promisor's performance becomes commercially impracticable as a result of the frustration of a mutual expectation of the contracting parties."[181] Alaska Civil Pattern Jury Instruction ("ACPJI") 24.08C provides that a party must demonstrate two elements when claiming this defense:

(1) an event occurred which made the [party's] performance impracticable because of extreme and unreasonable difficulty (expense) (injury) (loss) to [party]; and

(2) the event which occurred was not reasonably foreseeable by the parties when the contract was made.

Comment (b) to the Restatement (Second) Contracts § 261 explains: "In order for a supervening event to discharge a duty under this Section, the non-occurrence of that event must have been a 'basic assumption' on which both parties made the contract."[182] Here, impossibility/impracticability is A-1's affirmative defense, so A-1 bears the burden of proof.[183]

---

[180] Docket 97 at 9-10 (A-1 Opp. Impossibility).

[181] *Gildersleeve*, 670 P.2d at 375 (citing *N. Corp. v. Chugach Elec. Ass'n*, 518 P.2d 76, 80-82 (Alaska 1974)) (affirming dismissal of impossibility defense because "[p]erformance was not rendered impracticable, or even particularly difficult").

[182] Restatement (Second) Contracts § 261, comment b (1981).

[183] *Agen v. Dep't of Rev.*, 945 P.2d 1215, 1220 (Alaska 1997) ("[T]he burden of proof of an affirmative defense is on the party raising the defense.") (citations omitted).

The Court has reviewed the evidence submitted by each party and concludes that material questions of fact preclude summary judgment on this defense. There remain questions of fact concerning whether the ground conditions at Long Island were foreseeable, and whether they made A-1's performance impracticable. The parties also dispute whether Alcan precluded A-1 from visiting the sites, or whether A-1 chose to forego the inspection and assume the risk. Alcan's argument that Loushin constructed the terms of the contract to account for risks associated with poor ground conditions is compelling,[184] but insufficient to eliminate questions of fact concerning whether these particular ground conditions were foreseeable. And while Alcan Madill operator George Barnes states that the Madill operated effectively on Long Island in 2010 and 2011,[185] Madill operator Ron Perry describes Madill breakdowns and "extreme" logging conditions.[186] Thus, questions of fact remain concerning the impracticability of A-1's performance.

However, the Court finds unpersuasive A-1's argument that Alcan's alleged failure to maintain an on-site representative or to provide decent working conditions support the affirmative defense of impossibility/impracticability. These claims may have supported a timely breach of contract claim or may support A-1's estoppel argument, but they do not constitute the type of "event" that gives rise to an impossibility/impracticability defense.

---

[184] *See* Docket 72 at 9 (Alcan MSJ Impossibility).

[185] *See* Docket 66-1 ¶¶ 97-102 (3/25/13 Nichols Decl.); Docket 66-10 ¶¶ 6, 14 (3/25/13 Barnes Decl.)

[186] Docket 59-5 at 19:18-22:13 (10/1/12 Perry Dep.).

For the foregoing reasons, Alcan's motion at Docket 72 for summary judgment on A-1's impossibility/impracticability defense will be denied.

### D. A-1's Motion at Docket 77 for Summary Judgment on A-1's Affirmative Defense of Estoppel Will Be Denied.

At Docket 77, A-1 moves for summary judgment, arguing that Alcan is estopped from seeking damages for A-1's alleged breach of contract because of "Alcan's prior and continuing breach" by failing to maintain an on-site representative at Long Island.[187] A-1 further asserts that although Doig was present, he lacked the authority to represent Alcan.[188]

A party seeking equitable estoppel must demonstrate "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice."[189] In this action, estoppel is an affirmative defense, so A-1 bears the burden of proof.[190]

The Court has reviewed the evidence submitted by each party. There is no question that the first element of the defense is satisfied. The parties contracted to each maintain "a representative on site" to assist in "day-to-day management."[191] But

---

[187] Docket 77 at 3 (A-1 MSJ on Estoppel).

[188] Docket 77 at 3 (A-1 MSJ on Estoppel); *see also* Docket 66-8 at 13:12-20 (9/22/12 Ward Dep.); Docket 75-2 (3/21/10 Service Agreement between Alcan and Doig Enterprises). A-1 also argues that Alcan breached its contract by not offering to use a vessel to bring a replacement saw disk to Long Island. But Alcan directs the Court to the contract, which does not require Alcan to provide equipment transportation. Docket 38-10 (Contract).

[189] *Sidney v. Allstate Ins. Co.*, 187 P.3d 443, 451 (Alaska 2008) (quoting *Maynard v. State Farm Mut. Auto. Ins. Co.*, 902 P.2d 1328, 1330 (Alaska 1995)).

[190] *Agen v. Dep't of Rev.*, 945 P.2d 1215, 1220.

[191] Docket 38-10 ¶ 27 (Contract).

neither party strictly complied with that contract clause. Although Nichols assisted in "set[ting] the camp up" in Long Island, watched the Tigercat operate for several days, and made subsequent visits to Long Island, he was also often absent.[192] Ward was present on Long Island every day that the Tigercat was operable, but he was also absent numerous days.[193]

But material questions of fact remain with respect to the other two elements of estoppel, that is, whether A-1 relied upon this representation in entering into the contract and whether that reliance caused prejudice. Loushin asserts that A-1 "would not have agreed to the contract" if Alcan did not agree to provide an on-site representative.[194] However, the reliability of this assertion depends on Loushin's credibility, which the Court cannot determine on summary judgment. And although Ward asserts that he shared his concerns about the operation of the Tigercat with Doig,[195] it appears that Ward never complained to Nichols during the days that Nichols was present, and there is no evidence that Ward ever complained of Nichols's absence.[196] Ward did, however, provide updates to Loushin when he had phone access;[197] but there is no evidence that Loushin passed along any concerns to Alcan.

---

[192] Docket 38-7 at 53:23-54:1, 56:6-8 (8/14/12 Nichols Dep.); Docket 94-2 ¶ 3 (4/29/13 Nichols Decl.).

[193] Docket 85-3 at 34:8-35:1 (9/22/12 Ward Dep.); Docket 94-1 (A-1 Response to Plaintiff's First Discovery Requests).

[194] Docket 80-1 (4/18/13 Loushin Decl.).

[195] Docket 38-11 at 12:11-23, 13:11-23 (9/22/12 Ward Dep.).

[196] *See, e.g.,* Docket 94-2 ¶ 7 (4/29/13 Nichols Decl.); Docket 114 at 11 (Alcan Opp. MSJ Estoppel).

[197] Docket 38-11 at 12:20-23, 13:11-14:6 (9/22/12 Ward Dep.).

Given Ward's apparent lack of communication with Nichols, a reasonable jury might find that A-1 cannot demonstrate reliance on Nichols's presence. And it is unclear how A-1 was prejudiced by Alcan's lack of an on-site representative,[198] as Ward was able to, eventually, communicate his concerns about operation of the Tigercat to Loushin, who could have passed along those concerns.

Accordingly, A-1's motion for summary judgment on estoppel grounds will be denied.[199]

## CONCLUSION

For the foregoing reasons:

1.     A-1's motion at Docket 58 for summary judgment is **DENIED.**

2.     Alcan's motion at Docket 72 for summary judgment on A-1's affirmative defense of impossibility is **DENIED.**

3.     A-1's motion at Docket 74 for leave to amend its answer and to include various affirmative defenses and counterclaims is **GRANTED in part as to the affirmative defense of impossibility/impracticability and otherwise DENIED.**

4.     A-1's motion at Docket 77 for summary judgment on estoppel grounds is **DENIED.**

At Docket 111, the parties requested a settlement conference, and the Court granted that request.[200] The parties requested that the settlement conference occur after the Court issue a decision on the motions for summary judgment. The parties shall meet

---

[198]  Docket 77 at 5-6 (A-1 MSJ on Estoppel).

[199]  Because the Court denies summary judgment, it is not necessary to address Alcan's argument that it has a constitutional right to have this claim heard by a jury. *See* Docket 114 at 2-3 (Alcan Opp. MSJ Estoppel).

[200]  Docket 147 (Minute Entry).

and confer and file a request for settlement conference with the Chambers of the Honorable Timothy M. Burgess within 7 days of receiving this Order.

DATED at Anchorage, Alaska, this 13th day of November, 2013.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE